**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
148 West 24th Street, 8th Floor
New York, NY 10011
Tel.: 212-465-1188
Fax: 212-465-1181
*Attorneys for Plaintiffs, FLSA Collective Plaintiffs*
*and the Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ABRAHAM LOPEZ, ALEX PEREZ, CELSO IBAÑEZ, DONAL BARRIOS, EUGENIO REYES VALDEZ, and RIGOBERTO PEREZ, *on behalf of themselves, FLSA Collective Plaintiffs, and the Class,* <br><br> Plaintiffs, <br><br> v. <br><br> PIO PIO NYC, INC. <br>     d/b/a PIO PIO, <br> SIPAN RESTAURANT OF NEW YORK INC. <br>     d/b/a PIO PIO, <br> PIO PIO OCHO INC. <br>     d/b/a PIO PIO, <br> PIO PIO 34 INC. <br>     d/b/a PIO PIO, <br> PIO PIO 85 INC. <br>     d/b/a PIO PIO, <br> PIO PIO EXPRESS INC. <br>     d/b/a PIO PIO EXPRESS, <br> POLLOS A LA BRASA PIO, PIO, INC. <br>     d/b/a PIO PIO, <br> PIO-PIO RESTAURANT, INC. <br>     d/b/a PIO PIO, <br> EL PILLO INC. <br>     d/b/a AMARU, <br> MOCHICA GROUP CORP., <br> INES YALLICO, and AUGUSTO YALLICO, <br><br> Defendants. | Case No.: <br><br><br> **CLASS AND COLLECTIVE ACTION COMPLAINT** <br><br><br> **Jury Trial Demanded** |

Plaintiffs ABRAHAM LOPEZ, ALEX PEREZ, CELSO IBAÑEZ, DONAL BARRIOS, EUGENIO REYES VALDEZ, and RIGOBERTO PEREZ (collectively, "Plaintiffs"), on behalf of themselves and others similarly situated, by and through their undersigned attorneys, hereby file this Class and Collective Action Complaint against Defendants PIO PIO NYC, INC. d/b/a PIO PIO, SIPAN RESTAURANT OF NEW YORK, INC. d/b/a PIO PIO, PIO PIO OCHO, INC. d/b/a PIO PIO, PIO PIO 34, INC. d/b/a PIO PIO, PIO PIO 85, INC. d/b/a PIO PIO, PIO PIO EXPRESS, INC. d/b/a PIO PIO EXPRESS, POLLOS A LA BRASA PIO, PIO, INC. d/b/a PIO PIO, PIO-PIO RESTAURANT, INC. d/b/a PIO PIO, EL PILLO INC. d/b/a AMARU, MOCHICA GROUP CORP., (together, the "Corporate Defendants"), INES YALLICO, and AUGUSTO YALLICO (together, the "Individual Defendants," and collectively with the Corporate Defendants, the "Defendants") and state as follows:

## INTRODUCTION

1.    Plaintiffs allege, pursuant to the Fair Labor Standards Act, as amended, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), that they are entitled to recover from Defendants: (1) unpaid wages, including overtime, due to time shaving; (2) unpaid wages due to improper meal credit deductions; (3) liquidated damages; and (4) attorneys' fees and costs.

2.    Plaintiffs further allege, pursuant to the New York Labor Law ("NYLL"), that they are entitled to recover from Defendants: (1) unpaid wages, including overtime, due time shaving; (2) unpaid wages due to improper meal credit deductions; (3) statutory penalties; (4) liquidated damages; and (5) attorneys' fees and costs.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this controversy pursuant to 29 U.S.C. § 216(b), 28 U.S.C. §§ 1331, 1337 and 1343, and has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367.

4.      Venue is proper in the Southern District pursuant to 28 U.S.C. § 1391.

## PARTIES

5.      Plaintiff ABRAHAM LOPEZ is a resident of New York County, New York.

6.      Plaintiff ALEX PEREZ is a resident of Richmond County, New York.

7.      Plaintiff CELSO IBAÑEZ is a resident of Queens County, New York.

8.      Plaintiff DONAL BARRIOS is a resident of New York County, New York.

9.      Plaintiff EUGENIO REYES VALDEZ is a resident of Queens County, New York.

10.     Plaintiff RIGOBERTO PEREZ is a resident of Richmond County, New York.

11.      Defendants operate a chain of nine Peruvian Restaurants and a bar as a single integrated enterprise. All nine restaurants share the trade name "Pio Pio." The Pio Pio restaurants and bar are located at the following addresses:

   a. 62-30 Woodhaven Boulevard, Rego Park, NY 11379 (the "Rego Park Location");
   b. 84-02 Northern Boulevard, Jackson Heights, NY 11372 (the "Jackson Heights Location");
   c. 84-21 Northern Boulevard, Jackson Heights, NY 11372 (the "Jackson Heights To-Go Location");
   d. 264 Cypress Ave., Bronx, NY 10454 (the "Bronx Location");
   e. 604 Tenth Ave., New York, NY 10036 (the "Hell's Kitchen Location");
   f. 210 E. 34th St., New York, NY 10016 (the "Murray Hill Location");
   g. 702 Amsterdam Ave., New York, NY 10025 (the "Upper West Side Location");
   h. 1746 First Ave., New York, NY 10128 (the "Upper East Side Location");
   i. 282 Kings Hwy, Brooklyn, NY 11223 (the "Brooklyn Location") (Now Closed); and
   j. 84-13 Northern Blvd, Jackson Heights, NY 11372 (the "Amaru Bar")

(collectively, "Pio Pio Restaurants").

Corporate Defendants:

    a.  PIO PIO NYC, INC. d/b/a PIO PIO is a domestic business corporation organized under the laws of the State of New York, with a principal executive office located at 3268 85th Street, East Elmhurst, NY 11370 and an address for service of process located at c/o AUGUSTO YALLICO, 264 Cypress Avenues, Bronx, NY 10454. PIO PIO NYC, INC. owns and operates the Bronx Location, located at 264 Cypress Ave., Bronx, NY 10454. AUGUSTO YALLICO is the Chief Executive Officer of PIO PIO NYC, INC.

    b.  SIPAN RESTAURANT OF NEW YORK INC. d/b/a PIO PIO is a domestic business corporation organized under the laws of the State of New York, with a principal executive office located at 3268 85th Street, East Elmhurst, NY 11370 and an address for service of process located at c/o AUGUSTO YALLICO, 702 Amsterdam Avenue, New York, NY 10025. SIPAN RESTAURANT OF NEW YORK, INC. owns and operates the Upper West Side Location, located at 702 Amsterdam Ave., New York, NY. AUGUSTO YALLICO is the Chief Executive Officer of SIPAN RESTAURANT OF NEW YORK, INC.

    c.  PIO PIO OCHO INC. d/b/a PIO PIO is a domestic business corporation organized under the laws of the State of New York, with a principal executive office located at 3268 85th Street, East Elmhurst, NY 11370 and an address for service of process located at 604 Tenth Avenue, New York, NY 10036. PIO PIO OCHO, INC. owns and operates the Hell's Kitchen Location, located at 604 10th Ave., New York, NY 10036.

d.  PIO PIO 34 INC. d/b/a PIO PIO is a domestic business corporation organized under the laws of the State of New York, with a principal executive office located at 3268 85th Street, East Elmhurst, NY 11370, and an address for service of process located at c/o AUGUSTO YALLICO, 210 East 34th Street, New York, NY 10016. PIO PIO 34, INC. owns and operates the Murray Hill Location, located at 210 E. 34th St., New York, NY 10016. AUGUSTO YALLICO is the Chief Executive Officer of PIO PIO 34, INC.

e.  PIO PIO 85, INC. d/b/a PIO PIO, is a domestic business corporation organized under the laws of the State of New York, with a principal executive office located at 3268 85th Street, East Elmhurst, NY 11370 and an address for service of process located at c/o AUGUSTO YALLICO, 84-21 Northern Blvd, Jackson Heights, NY 11372. PIO PIO 85, INC. owns and operates the Jackson Heights To Go Location, located at 84-21 Northern Boulevard, Jackson Heights, NY 11372. AUGUSTO YALLICO is the Chief Executive Officer of PIO PIO 85, INC.

f.  PIO PIO EXPRESS, INC. d/b/a PIO PIO EXPRESS, is a domestic business corporation organized under the laws of the State of New York, with a principal executive office located at 3268 85th Street, East Elmhurst, NY 11370 and an address for service of process located at c/o AUGUSTO YALLICO, 1746 First Avenue, New York, NY 10128. PIO PIO EXPRESS, INC. owns and operates the Upper East Side Location, located at 1746 First Ave., New York, NY 10128. AUGUSTO YALLICO is the Chief Executive Officer of PIO PIO EXPRESS, INC.

g. POLLOS A LA BRASA PIO, PIO, INC. d/b/a PIO PIO, is a domestic business corporation organized under the laws of the State of New York, with a principal executive office located at 3268 85th Street, East Elmhurst, NY 11370 and an address for service of process located at c/o AUGUSTO YALLICO, 62-30 Woodhaven Boulevard, Rego Park, NY 11374. POLLOS A LA BRASA PIO, PIO, INC. operates the Rego Park Location, located at 62-30 Woodhaven Boulevard, Rego Park, NY 11374. AUGUSTO YALLICO is the Chief Executive Officer of POLLOS A LA BRASA PIO, PIO, INC.

h. PIO-PIO RESTAURANT, INC. d/b/a PIO PIO, is a domestic business corporation organized under the laws of the State of New York, with a principal executive office located at 3268 85th Street, East Elmhurst, NY 11370, and address for service of process located at c/o AUGUSTO YALLICO, 1746 First Avenue, New York, NY 10128. It operates the Jackson Heights Location, located at 84-02 Northern Boulevard, Jackson Heights, NY 11372. AUGUSTO YALLICO is the Chief Executive Officer of PIO-PIO RESTAURANT, INC.

i. EL PILLO INC. d/b/a AMARU, is a domestic business corporation organized under the laws of the State of New York, with a principal executive office located at 3268 85th Street, East Elmhurst, NY 11370 and an address for service of process located at 84-13 Northern Blvd, Jackson Heights, New York, 11372. EL PILLO INC. owns and operates the bar Amaru located at 8413 Northern Blvd, Jackson Heights, New York, 11372. AUGUSTO YALLICO is the Chief Executive Officer of EL PILLO, INC.

6

j.  MOCHICA GROUP CORP. is a domestic business corporation organized under the laws of the State of New York, with a principal executive office located at 3268 85th Street, East Elmhurst, NY 11370 and an address for service of process located at PO Box 690050, New York, NY 11370. MOCHICA GROUP CORP. owns and operates the Pio Pio Restaurants through its 100% ownership of each of the other Corporate Defendants, each of which owns and operates individual Pio Pio Restaurants directly.

12.    Individual Defendant AUGUSTO YALLICO is the Chief Executive Officer, owner, and principal of all Corporate Defendants. AUGUSTO YALLICO hired the Plaintiff directly and operates and supervises the Pio Pio Restaurants.

13.    Individual Defendant INES YALLICO is a principal, owner, and controlling member of all Corporate Defendants. At all relevant times, INES YALLICO has been the General Manager of the Pio Pio Restaurants.

14.    Each of the Individual Defendants had the power and exercised the authority to (and also delegated to managers and supervisors the power to) (i) fire and hire all employees of Pio Pio Restaurants; (ii) determine their rate and method of pay; (iii) determine their work schedules; (iv) maintain employees' employment records; and (v) otherwise affect the quality of employment of Plaintiffs, FLSA Collective Plaintiffs, and the Class. The Individual Defendants exercised functional control over the business and financial operations of the Corporate Defendants, including ensuring that employees properly prepared food and served customers to ensure that the Pio Pio Restaurants were operating efficiently and profitably. At all times, employees could complain to either of the Individual Defendants directly regarding any of the

terms of their employment, and the Individual Defendants would have the authority to effect any changes to the quality and terms the employment.

15.     The Pio Pio Restaurants are operated from a single central office located at 3268 85th Street, East Elmhurst, NY 11370. The central office is the operational headquarters of Corporate Defendant MOCHICA GROUP CORP. All employee and payroll records were managed and retained at the central office. Additionally, bookkeeping, human resources, and marketing personnel worked from the central office to manage all Pio Pio restaurants.

16.     Individual Defendants, INES YALLICO and AUGUSTO YALLICO are officers in charge of daily operations of each of the Pio Pio restaurants. At all times, INES YALLICO and AUGUSTO YALLICO control each of the managers at each of the Pio Pio restaurants. At all times, INES YALLICO and AUGUSTO YALLICO have a direct or indirect controlling interest in each of the Pio Pio restaurants.

17.     The Defendants operate all Pio Pio Restaurants and Amaru Bar as a single integrated enterprise. Specifically, the restaurants and bar are engaged in related activities, share common ownership, and have a common business purpose:

    a.  Related Activities

        i.  The Pio Pio Restaurants and Amaru Bar interchange supplies and employees are shifted among the restaurants and bar. Employees are also allowed to cover shifts at different locations. For example, Plaintiff BARRIOS worked at multiple locations throughout his employment.

        ii.  The Pio Pio Restaurants and Amaru Bar are operated from a single central office located at 3268 85th Street, East Elmhurst, NY 11370. The central office is the operational headquarters of Corporate Defendant MOCHICA

GROUP CORP. All employee and payroll records were managed and retained at the central office. Additionally, bookkeeping, human resources, and marketing personnel worked from the central office to manage all Pio Pio Restaurants and Amaru Bar.

iii. The Pio Pio Restaurants are all advertised jointly as a common enterprise on Defendants' website, htttp://www.piopio.com.

b. Common Ownership

i. Individual Defendants, INES YALLICO and AUGUSTO YALLICO are officers in charge of daily operations of each of the Pio Pio Restaurant and Amaru Bar. They set all wage and hour policies, which are effected by managers at each Pio Pio Restaurant.

ii. At all times, INES YALLICO and AUGUSTO YALLICO control each of the managers at each of the Pio Pio Restaurant and Amaru Bar.

iii. At all times, INES YALLICO and AUGUSTO YALLICO have a direct or indirect controlling interest in each of the Pio Pio Restaurant and Amaru Bar.

c. Common Business Purpose

i. The Pio Pio Restaurants and Amaru Bar all share similar menu items and specialize in serving Peruvian cuisine and drinks.

18. Although the Plaintiffs did not work at all the Pio Pio Restaurants, all of the restaurants are appropriately named in this Complaint through the relevant Corporate Defendants described above. Because all of the restaurants share identical illegal wage and hour policies, the

restaurants (and the relevant Corporate Defendants) are properly named because of outstanding liability to the Plaintiffs.

19.     At all relevant times, each Corporate Defendant was and continues to be an "enterprise engaged in commerce" within the meaning of the FLSA.

20.     At all relevant times, the work performed by Plaintiffs, FLSA Collective Plaintiffs, and Class members was directly essential to the business operated by Defendants.

21.     Plaintiffs have fulfilled all conditions precedent to the institution of this action and/or such conditions have been waived.

## FLSA COLLECTIVE ACTION ALLEGATIONS

22.     Plaintiffs bring claims for relief as a collective action pursuant to the FLSA, 29 U.S.C. § 216(b), on behalf of all current and former non-exempt front-of-house and back-of-house employees (including waiting staff, delivery workers, cooks, food preparers, porters, kitchen assistants, busboys, servers, among others) employed by Defendants on or after the date that is six (6) years before February 14, 2025, as indicated on parties' executed Tolling Agreement (attached **as Exhibit A**) ("FLSA Collective Plaintiffs").

23.     At all relevant times, Plaintiffs and FLSA Collective Plaintiffs are and have been similarly situated, have had substantially similar job requirements and pay provisions, and are and have been subjected to Defendants' decisions, policies, plans, programs, practices, procedures, protocols, routines, and rules, all culminating in a willful failure and refusal to pay Plaintiffs and FLSA Collective Plaintiffs their proper wages, including overtime, due to: (1) time shaving, and (2) invalid meal credit deductions.

24.     The claims of Plaintiff stated herein are essentially the same as those of FLSA Collective Plaintiffs.

25.    The claims for relief are properly brought under and maintained as an opt-in collective action pursuant to the FLSA, 29 U.S.C. § 216(b). The FLSA Collective Plaintiffs are readily ascertainable. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided to the FLSA Collective Plaintiffs via first class mail to the last address known to Defendants.

## RULE 23 CLASS ALLEGATIONS

26.    Plaintiffs bring claims for relief pursuant to the Federal Rules of Civil Procedure ("F.R.C.P.") Rule 23, on behalf of all current and former non-exempt front-of-house and back-of-house employees (including waiting staff, delivery workers, cooks, food preparers, porters, kitchen assistants, busboys, servers, among others) employed by Defendants on or after the date that is six (6) years before February 14, 2025, as indicated on parties' executed Tolling Agreement (attached **as Exhibit A**) (the "Class").

27.    All said persons, including Plaintiffs, are referred to herein as the "Class" or "Class Members." The Class Members are readily ascertainable. The number and identity of the Class Members are determinable from the records of Defendants. The hours assigned and worked, the position held, and the rates of pay for each Class Member are also determinable from Defendants' records. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided by means permissible under F.R.C.P. 23.

28.    The proposed Class is so numerous that a joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court. Although the precise number of such persons is unknown, the facts on which the calculation of that number are presently within the sole control of Defendants, there is no doubt that there are more than forty

(40) members of the Class. The Class further includes a subclass that is comprised of all non-exempt back-of-house employees employed by and working for Defendants at their Upper East Side location when the new manager, Jairo [Last Name Unknown or "LNU'], took over in or around March 2024. This Subclass under Jairo's management was required to work off-the-clock by Jairo, as Jairo wanted the employees to quit so Jairo could replace them with his family and friends. This Subclass is also comprised of at least 40 members. Plaintiffs are members of the Class. Plaintiff EUGENIO REYES VALDEZ is member of both the Class and the Subclass.

29.     Plaintiffs' claims are typical of those claims, which could be alleged by any member of the Class, and the relief sought is typical of the relief, which would be sought by each member of the Class in separate actions. All the Class Members were subject to the same corporate practices of Defendants, as alleged herein, of (1) failure to pay proper wages, including overtime wages, due to timeshaving, (2) failure to pay proper wages due to invalid meal credit deductions, (3) failure to pay proper wage statements, and (4) failure to provide proper wage and hour notices. Defendants' corporate-wide policies and practices affected all Class Members similarly, and Defendants benefited from the same type of unfair and/or wrongful acts as to each Class Member. Plaintiffs and other Class Members sustained similar losses, injuries and damages arising from the same unlawful policies, practices and procedures.

30.     Similarly, Plaintiff EUGENIO REYES is able to fairly and adequately protect the interests of the Subclass and has no interests antagonistic to the Class. All Subclass members were subject to the same corporate policies of time-shaving due to off-the-clock work. Plaintiff EUGENIO REYES and other Subclass Members sustained similar losses, injuries and damages arising from the same unlawful policies, practices and procedures.

31.     Plaintiffs are able to fairly and adequately protect the interests of the Class and has

no interests antagonistic to the Class. Plaintiffs are represented by attorneys who are experienced

and competent in both class action litigation and employment litigation and have previously

represented Plaintiffs in wage and hour cases.

32.     A class action is superior to other available methods for the fair and efficient

adjudication of the controversy – particularly in the context of the wage and hour litigation where

individual Class Members lack the financial resources to vigorously prosecute a lawsuit against a

corporate defendant. Class action treatment will permit a large number of similarly situated

persons to prosecute common claims in a single forum simultaneously, efficiently, and without the

unnecessary duplication of efforts and expense that numerous individual actions engender.

Because losses, injuries and damages suffered by each of the individual Class Members are small

in the sense pertinent to a class action analysis, the expenses and burden of individual litigation

would make it extremely difficult or impossible for the individual Class Members to redress the

wrongs done to them. On the other hand, important public interests will be served by addressing

the matter as a class action. The adjudication of individual litigation claims would result in a great

expenditure of Court and public resources; however, treating the claims as a class action would

result in a significant saving of these costs. The prosecution of separate actions by individual

members of the Class would create a risk of inconsistent and/or varying adjudications with respect

to the individual members of the Class, establishing incompatible standards of conduct for

Defendants and resulting in the impairment of Class Members' rights and the disposition of their

interests through actions to which they were not parties. The issues in this action can be decided

by means of common, class-wide proof. In addition, if appropriate, the Court can, and is

empowered to, fashion methods to efficiently manage this action as a class action.

33.     Defendants and other employers throughout the United States violate state labor laws. Current employees are often afraid to assert their rights out of fear of direct or indirect retaliation. Former employees are fearful of bringing claims because doing so can harm their employment, future employment, and future efforts to secure employment. Class actions provide Class Members who are not named in the Complaint a degree of anonymity, which allows for the vindication of their rights while eliminating or reducing these risks.

34.     There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members, including:

(a)     Whether Defendants employed Plaintiffs and Class Members within the meaning of the NYLL and applicable state laws;

(b)     What are and were the policies, practices, programs, procedures, protocols and plans of Defendants regarding the types of work and labor for Plaintiffs and Class Members;

(c)     At what common rate, or rates subject to common methods of calculation, was and are Defendants required to pay Plaintiffs and Class Members for their work;

(d)     Whether Defendants paid Plaintiffs and Class Members the proper compensation, including overtime, for all hours worked under the New York Labor Law;

(e)     Whether Defendants operated their business with a policy of failing to pay wages, including overtime, to Plaintiffs and Class members for all hours worked, due to time shaving;

(f)    Whether Defendants improperly deducted meal credits from Plaintiffs and Class members;

(g)    Whether Defendants properly notified Plaintiff and Class Members of their pay rates;

(h)    Whether Defendants provided proper wage statements to Plaintiff and Class Members;

(i)    Whether Defendants provided proper wage and hour notices to Plaintiff and Class Members; and

(j)    Whether Defendants provided wage and hour notices, at date of hiring and with each change in pay rate thereafter, to all non-exempt employees, per requirements of the NYLL.

## STATEMENT OF FACTS

*Plaintiff ABRAHAM LOPEZ*

35.    In or around June 2017, Plaintiff ABRAHAM LOPEZ ("Plaintiff LOPEZ") was hired by Defendants to work as a delivery worker at their Upper East Side location. In or around June 2018, Defendants changed Plaintiff LOPEZ's position from a delivery worker to a cook. Plaintiff LOPEZ's employment with Defendants terminated in or around March 2020.

36.    Throughout his employment, Defendants compensated Plaintiff LOPEZ at the prevailing New York State minimum wage rate.

37.    At all relevant times, Plaintiff LOPEZ was compensated every week by check.

38.    From in or around June 2017 to in or around June 2018, as a delivery worker, Plaintiff LOPEZ was scheduled to work two (2) days per week from 3:00 p.m. to 11:00 p.m. and

three (3) days per week from 11:00 a.m. to 9:00 p.m., for a total of five (5) days per week and forty-six (46) hours per week.

39.     From in or around June 2018 to the end of his employment with Defendants, as a cook, Plaintiff LOPEZ was scheduled to work on Fridays and Saturdays from 11:00 a.m. to 11:00 p.m. and Mondays, Tuesdays, and Wednesdays from 3:00 p.m. to 11:00 p.m., for a total of five (5) days per week and forty-eight (48) hours per week.

*Plaintiff ALEX PEREZ*

40.     In or around June 2017, Plaintiff ALEX PEREZ ("Plaintiff PEREZ") was hired by Defendants to work as a delivery packer at their Upper East Side location. Plaintiff PEREZ employment with Defendants terminated in or around June 2020.

41.     At all relevant times, Plaintiff PEREZ was compensated at fifteen dollars ($15.00) per hour every week by check.

42.     Throughout his employment, Plaintiff PEREZ was scheduled to work four (4) days per week from 11:00 a.m. to 4:00 p.m., for a total of twenty (20) hours per week.

*Plaintiff CELSO IBAÑEZ*

43.     In or around January 2018, Plaintiff CELSO IBANEZ ("Plaintiff IBANEZ") was hired by Defendants to work as a delivery person at their Upper East Side location. Plaintiff IBANEZ's employment with Defendants terminated in or around September 2023.

44.     At all relevant times, Plaintiff IBANEZ was compensated at fifteen dollars ($15.00) per hour every week by check.

45.     Throughout his employment, Plaintiff IBANEZ was scheduled to work four (4) days per week from 3:00 p.m. to 11:00 p.m., for a total of thirty-two (32) hours per week.

*Plaintiff DONAL BARRIOS*

46.    From in or around January 2017 to June 2019, Plaintiff DONAL BARRIOS ("Plaintiff BARRIOS") was hired by Defendants to work as a delivery person for the first three (3) months of his employment at their Murray Hill location. Plaintiff BARRIOS then transitioned into the position as a cook for the remainder of his employment at the same location. In or around September 2023, Plaintiff BARRIOS was re-hired by Defendants to work as a cook at their Upper East Side location. Plaintiff's employment with Defendants was terminated in or around February 2024.

47.    From the start of his employment until in or around March 2017 during his first employment period, Plaintiff BARRIOS was compensated at sixteen dollars and seventy-five cents ($16.75) per hour for the first three (3) months as a delivery person. Once Plaintiff BARRIOS had transitioned into the position as a cook in or around March 2017 until the end of his first employment period, Plaintiff BARRIOS was compensated at seventeen dollars ($17.00) per hour every week by check. In or around September 2023 of his second employment period until four (4) weeks before his termination, Plaintiff BARRIOS was compensated at eighteen dollars ($18.00) per hour each week by check. During the remainder of his second employment period until his termination, Plaintiff BARRIOS was given a raise of nineteen dollars ($19.00) per hour each week by check.

48.    Throughout his employment at both of Defendants' locations, Plaintiff BARRIOS was scheduled to work on Mondays from 9:00 a.m. to 3:30 p.m. and Tuesdays to Fridays from 10:00 a.m. to 3:30 p.m. for a total of five (5) days per week and twenty-eight and a half (28.5) hours per week.

*Plaintiff EUGENIO REYES VALDEZ*

49.     In or around August 2020, Plaintiff EUGENIO REYES VALDEZ ("Plaintiff VALDEZ") was hired by Defendants to work as a cook at their Upper East Side location. Plaintiff VALDEZ was terminated by Defendants on or around July 31, 2024.

50.     From the start of his employment to in or around June 2021, Plaintiff VALDEZ was compensated at an hourly rate of fifteen dollars and twenty-five cents ($15.25). At some point between in or around June 2021 to May 2024, Plaintiff VALDEZ' hourly compensation was raised to sixteen dollars ($16.00) and then seventeen dollars ($17.00) per hour. From in or around May 2024 until the end of his employment, Plaintiff was compensated at an hourly rate of nineteen dollars ($19.00).

51.     At all times throughout his employment, Plaintiff VALDEZ received weekly compensation by check.

52.     From the start of his employment to in or around June 2024, Plaintiff VALDEZ was scheduled to work Monday to Friday, from 7:00 a.m. to 3:00 p.m., for a total of five (5) days a week and forty (40) hours per week. During the last two weeks of his employment before termination, Plaintiff VALDEZ was scheduled to work Monday to Friday, from 8:00 a.m. to 4:30 p.m., for a total of five (5) days and forty-two and a half (42.5) hours per week.

*Plaintiff RIGOBERTO PEREZ*

53.     In or around January 2011, Plaintiff RIGOBERTO PEREZ ("Plaintiff PEREZ") was hired by Defendants to work as a delivery person at their Upper East Side location. Plaintiff PEREZ was terminated by Defendants in or around June 2021.

54.     Throughout his employment with Defendants, Plaintiff PEREZ was always compensated at the prevailing New York State minimum wage.

55.    Throughout his employment, Plaintiff PEREZ always worked five (5) days per week, either from 9:00 a.m. to 3:00 p.m. or 4:00 p.m. to 9 p.m.

### *Time Shaving Claims*

56.    At all relevant times, Plaintiffs were unable to take a free and clear thirty (30) minute meal break as they were required to work through their breaks due to their heavy workload. Despite being required to work through their meal breaks, Plaintiffs were still required to clock-out for thirty (30) minutes for their meal breaks. Additionally, Plaintiffs were only able to clock back in once they had spent all thirty (30) minutes. Thus, because Plaintiffs were clocked out during their meal breaks even when they were working, they were not compensated for the time they worked during their meal breaks.

57.    Plaintiffs PEREZ, IBAÑEZ, BARRIOS, and PEREZ were required to work during their meal breaks at least two (2) to three (3) times per week. Thus, they were not compensated for at least one (1) to one and a half (1.5) hours each week due to this policy.

58.    Plaintiffs LOPEZ and VALDEZ were required by Defendants to work through their meal breaks every day. Thus, they were not compensated for at least two and a half (2.5) hours each week due to this policy.

59.    Similarly, FLSA Collective Plaintiffs and Class members were also required to work during their meal breaks. However, they were required to clock-out during their meal break even if they were working through it. As a result, Defendants time shaved Plaintiffs, FLSA Collective Plaintiffs, and Class members thirty (30) minutes each shift they were required to work through their meal break because of this policy.

60.     Plaintiff BARRIOS was subject to this unlawful policy regardless of which Restaurant he worked at. Based on Plaintiffs' experiences, observations and conversations with co-workers, Defendants implemented the same time-shaving policies across all Restaurants.

61.     Aside from requiring Plaintiffs and Class members to work through their meal breaks uncompensated, a subclass of employees who were employed and working for Defendants' Upper East Side location when the new management took over was timeshaved as well. In or around March 2024, the new manager, Jairo [LNU], started working for Defendants. One of his policies was to require employees to work off-the-clock before and after their scheduled shift. He implemented this unlawful policy as he wanted the existing employees at that time to quit so he could replace them with his family and friends. Plaintiff VALDEZ was subject to this policy. Plaintiff VALDEZ was regularly required to arrive early and work for approximately twenty (20) minutes before her scheduled shift. Moreover, Plaintiff Valdez was regularly required to clock-out once his scheduled shift ended but was required to continue working for at least thirty (30) minutes as Jairo would ask him to finish his tasks or perform additional tasks before leaving. Similarly, the Subclass Members were required by Jairo to perform pre- and post- shift work but were not compensated for it.

### *Improper Meal Credit Deduction Claim*

62.     Throughout Plaintiffs' employment, Defendants improperly deducted a meal credit from Plaintiffs' wages under FLSA, 29 U.S.C. § 203(m) and 12 N.Y.C.R.R. § 146-1.9, without regard to whether the meal credit deducted exceed the meal's "reasonable cost", whether the meals provided satisfied New York State's nutritional requirements containing all four food groups, whether employees actually consumed the credited meals or not, and whether employees consumed the credited meals during a reasonable meal period or not.

63.    Defendants' meal credit deductions were improper because they did not provide a proper meal which includes at least one of the types of food from all four of the following groups: (i) fruits or vegetables; (ii) grains or potatoes; (iii) eggs, meat, fish, poultry, dairy, or legumes; and (iv) tea, coffee, milk, or juice. Plaintiffs were only served rice, beans and chicken every workday. Some days, Defendants would even serve leftovers from the previous day. Similarly, all FLSA Collective Plaintiffs and Class Members were served the same food but were improperly deducted a meal credit.

64.    Additionally, Defendants' meal credit deductions were improper as Plaintiffs and Class Members often did not have the opportunity to actually consume the credit meals as they were often required to work through their meal breaks. Despite not consuming their meals, Plaintiffs were still automatically deducted a meal credit.  Similarly, FLSA Collective Plaintiffs and Class Members were deducted a meal credit even when they worked through their meal breaks and were not able to consume the meals provided. and (2) the meals were never offered to Plaintiffs during a reasonable meal period as Plaintiffs were almost never provided a proper meal break. As a result, Defendants claimed improper meal credits from Plaintiffs every day. FLSA Collective Plaintiffs and Class Members were also improperly deducted for meal credits every day.

### *WTPA Violation Claims*

65.    Plaintiffs and Class Members never received a wage notice from Defendants. They also did not receive accurate wage statements from Defendants.

66.    In violation of the Wage Theft Protection Act ("WTPA")—incorporated into NYLL—Defendants knowingly and willfully operated their business with a policy of not providing wage notices to Plaintiffs and Class members at the beginning of their employment with Defendants.

67.     Defendants further violated the WTPA by failing to provide Plaintiffs and Class Members with accurate wage statements, which the WTPA requires. *See Rojas v. Splendor Landscape Designs*, Ltd., 268 F. Supp. 3d 405, 413 (E.D.N.Y. 2017) ("Here, it is undisputed that the wage statements furnished to Plaintiffs were inaccurate in that they did not reflect all of the hours worked by Plaintiffs. Nor did they reflect Plaintiffs' *actual* pay rates.") (emphasis added); *Brito v. Lucky Seven Rest. & Bar, LLC*, 2021 U.S. Dist. LEXIS 55822, at \*36 (S.D.N.Y. Mar. 24, 2021) ("And of course, the wage statements are inaccurate more generally in falsely portraying Brito's pay as the product of an hourly, rather than a weekly, wage rate."). The wage statements furnished to Plaintiffs were inaccurate because the wages stated therein did not include proper rate at which Plaintiffs should be paid and the actual hours that Plaintiffs worked.

68.     In failing to provide proper wage statements and notices, Defendants have failed to comply with the law in a manner that entails a concrete harm to an interest identified by the New York State legislature. As one Court observed:

> Here, Plaintiffs allege that Defendants failed to furnish them with proper wage notices and statements, as required by NYLL §§ 195(1) and 195(3). These provisions were enacted as part of New York's Wage Theft Prevention Act ("WTPA"), N.Y. Lab. Law § 195, which sought "to expand the rights of employees to seek civil and criminal avenues of remedy for their employers failing to follow labor law appropriately and the specifications therein." N.Y. Spons. Mem., 2010 S.B. 8380. More specifically, the New York State Assembly passed the WTPA to address studies showing that a large number of employees were not being paid the wages owed to them, and that many employers were not adequately informing their employees of their wages and how they are calculated in language the employees could understand. *Id.* The New York State Assembly opined that existing penalties did not adequately deter employers from paying less than the wages owed, and stated that the WTPA would dramatically change this by increasing penalties for violating employees' rights. *Id.*

*Imbarrato v. Banta Mgmt. Servs.*, 2020 U.S. Dist. LEXIS 49740, \*21-22 (S.D.N.Y. March 20, 2020).

69.     Here, Defendants' failure goes beyond generating a risk of harm to Plaintiffs and Class Members. Defendants' conduct actually harmed Plaintiffs and Class Members. Defendants' failure to provide wage notices and paystubs listing all hours actually worked and rates of pay, including overtime hours and overtime rates, deprived employees of the ability to contest the pay provided by Defendants, allowed Defendants to hide their wrong-doing, and necessitated the current litigation to vindicate Plaintiffs' and Class Members' rights. This conduct ensured Defendants' ability to further delay providing proper compensation to low wage earners entitled to protection under federal and state law. Defendants' failure to provide wage notices and wage statements to employees allowed Defendants to hide their responsibility and deprive employees of timely compensation.

70.     Had the wage statements Defendants provided to Plaintiffs and Class Members accurately listed the total wages that Plaintiffs and Class Members are entitled to, as opposed to what they received, Defendants would have had to either (a) increase the latter to correspond to the with the former or (b) forthrightly acknowledge, by way of the wage statement, that the wages received did *not* correspond to the wages that Plaintiffs and Class Members were entitled to. Either possibility would have allowed Plaintiffs and Class Members to vindicate their rights under the NYLL. The deprivation of these possibilities therefore constitutes an injury.

71.     The failure to provide proper wage notices and wage statements continues to result in delayed payment of all proper wages owed to Plaintiffs and Class Members. This delayed payment caused Plaintiffs and Class Members to struggle to pay bills and other debts.

72.     Defendants knowingly and willfully operated their business with a policy of not providing proper wage notices and wage statements as required by NYLL.

73.     The direct effect of understating the wages earned on wage statements, is to reduce the employee earnings that the employer later reports to the IRS through the employee's W-2 form, as such information is derived from the information on employees' wage statements. See *Mills v. Mills*, 2021 Minn. Dist. LEXIS 200, *5 (Minn. Dist. Ct., Anoka County, Tenth Judicial District May 20, 2021) ("Petitioner's gross annual income, based on her 2020 W-21 and paystub dated 12/24/20, is $130,321.30"); T.F. v. N.F., 820 N.Y.S.2d 846, 846 (Sup. Ct., Suffolk Cty., June 22, 2006) ("In 2005 the plaintiff earned $ 133,086 as reflected on his final year paystub and W-2").[1]

74.     The effect of reporting reduced wages on an employees' W-2 is, in turn, to reduce the amount of social security benefits available to the employee, as an employee's entitlement to benefits reflects how much money he or she is reported as having contributed to the social security system. *See McGauran v. Soc. Sec. Comm'n*, 2001 U.S. Dist. LEXIS 3187, *7 (N.D. Cal. March 19, 2001) ("Social security benefits are based upon the worker's earnings as reported to the [SSA] . . . [and] the worker's earnings are used to determine insured status for entitlement to retirement and to calculate cash benefit rates." (quoting Social Security Administration, Handbook § 1400 (1997)); *Coward v. Zurich Am. Ins. Co.*, 2011 U.S. Dist. LEXIS 74543, *3 (N.D. Ill. July 8, 2011) ("Under the Social Security statute, entitlement depends on 'the total of the wages paid . . . to an individual in a calendar year.'") (quoting 42 U.S.C. § 413(a)(2)(A)(ii)).

---

[1] It is true that the wages reported on W-2 forms are not always precisely identical to those listed on an employees' last paystub for the year. One reason for is, as the IRS explains, that "W-2 wages include: (i) the total amount of wages as defined in section 3401(a); (ii) the total amount of elective deferrals (within the meaning of section 402(g)(3)); (iii) the compensation deferred under section 457; and (iv) the amount of designated Roth contributions (as defined in section 402A)." https://www.irs.gov/pub/irs-drop/rp-19-11.pdf. However, the possibility, that wages listed on a W-2 might be affected by such considerations does not change the fact that the base wages on the W-2 are derived from paystubs. The paystub processing service *realcheckstubs* explains: "A pay stub contains crucial information that assists in calculating W2 wages. Paystub provides gross wages, deductions, taxes withheld, and other income-related data. Individuals gather the necessary figures required for accurate W2 calculation by referring to the pay stub." https://www.realcheckstubs.com/blog/paystubs/6-steps-how-to-calculate-w-2-wages-from-paystub.

75.    "In the wake of the Supreme Court's decision in *TransUnion*, courts in this Circuit have held that plaintiffs lack standing to bring wage notice and statement claims under the NYLL absent any concrete, downstream consequences of the recordkeeping violation." *Chen v. Lilis 200 W. 57th Corp.*, 2023 U.S. Dist. LEXIS 38163, at *18, (S.D.N.Y. Mar. 7, 2023). "On the other hand, 'allegations' that go 'beyond asserting a bare statutory violation and sufficiently allege concrete harm' resulting from 'the underpayment of wages' pass muster because 'monetary injury is a concrete harm sufficient for purposes of Article III standing.'" *Thompson v. Elev8 Ctr. N.Y.*, *LLC*, 2023 U.S. Dist. LEXIS 122504, *21 (S.D.N.Y. July 17, 2023) (quoting *Mateer v. Peloton Interactive, Inc.*, 2022 U.S. Dist. LEXIS 125017, at *4 (S.D.N.Y. July 14, 2022)).

76.    Here, it is clear that Defendants' failure to provide Plaintiffs and Class Members with accurate wage statements entailed "concrete, downstream consequences" involving monetary injury. Had the wages earned been accurately reported for a given pay period, Defendants' automatic payroll system would have correspondingly increased the wages paid for that period, which in turn would have been reflected in the W-2s that Defendants submitted to the IRS on behalf of Plaintiffs and Class Members. That, in turn, would have increased Plaintiffs' and Class Members' entitlement to social security benefits. Because the inaccuracy prevented this outcome, it constitutes an injury sufficient to provide Plaintiffs with Article III standing.

77.    Courts agree that the misreporting of wages constitutes a concrete injury cognizable under Article III:

> The Seventh Circuit in *Calderon* squarely addressed FICA standing. The plaintiffs in *Calderon* were former employees alleging the employer failed to pay their FICA taxes. 999 F.2d at 1105-06. The Seventh Circuit found that the plaintiffs lacked standing to compel the employer to pay their FICA taxes because "[b]enefits do not. . . depend on whether the employer actually paid the taxes." *Id*. at 1106. Plaintiffs could, however, enforce FICA's reporting requirement because it is the reporting of income that triggers benefits, and losing benefits is an injury under *Lujan*. *Id*. Whether the employer in *Calderon* made FICA payments on the

plaintiffs' behalf had no bearing on the plaintiffs' entitlement to benefits. *Id*. "[T]he plaintiff's real interest lies in ensuring that the [employer] make the proper reports of their income." *Id*.

*Coward*, 2011 U.S. Dist. LEXIS 74543, at *3-4.

78.    The case at bar is somewhat different from *Coward* inasmuch as Defendants actually underpaid Plaintiffs and other employees rather than merely misreporting their income. But this distinction has no bearing on the question of Article III standing, since it is still the case that "it is the reporting of income that triggers benefits, and losing benefits is an injury." *Id*. Plaintiffs and Class Members lost benefits by virtue of how Defendants reported their income, and how Defendants reported employees' income was the direct outcome of the inaccuracies in employees' wage statements. That is why "Plaintiffs have standing to enforce the statutory reporting requirements" imposed by the WTPA. *Calderon v. Witvoet*, 999 F.2d 1101, 1106 (7th Cir. 1993).

79.    Whether or not any Class members are presently eligible for social security benefits is legally immaterial. *See id*. ("Although only citizens and aliens residing in the United States may receive benefits, 42 U.S.C. § 402(t), plaintiffs may eventually fulfill this requirement and therefore are entitled to keep their Social Security accounts accurate.").

80.    The *Calderon* court stressed that an employee's interest in ensuring that an employer properly report the employee's income is amplified by the difficulty of persuading the government to correct errors: to correct errors:

The practical difficulty is that eligibility for Social Security benefits presumptively depends on reports that employers send to the government. A worker who seeks credit for unreported income bears the burden of proof, 42 U.S.C. § 405(c)(3), (4), which will be hard to carry if the employer has not furnished the customary documentation. The government believes employers who report earnings, because these reports are costly to make--they entail paying a substantial tax. The government tends not to believe undocumented claims by employees, because these

claims are essentially costless yet could establish entitlement to large pensions or disability benefits.

All of this means that the plaintiffs' real interest lies in ensuring that the Witvoets make the proper reports of their income.

*Id.*

81.     Here, the problem is not merely challenging but insurmountable. Plaintiffs and Class Members cannot even attempt to have their earnings report corrected because Defendants *did* report what they actually paid Plaintiffs and Class Members. The problem, rather, is that Plaintiffs and Class Members were underpaid. Yet the ultimate effect is the same—reduced social security eligibility. Because "[u]nder the Social Security statute, entitlement depends on 'the total of the wages paid . . . to an individual in a calendar year,'" Plaintiffs were irreversibly injured with respect to his social security benefits as soon as Defendants sent his W-2 to the IRS. *Coward*, 2011 U.S. Dist. LEXIS 74543, at *3 (N.D. Ill. July 8, 2011) (quoting 42 U.S.C. § 413(a)(2)(A)(ii)).

82.     Defendants knowingly and willfully operated their business with a policy of not providing proper wage statements and notices as required under the NYLL.

83.     Defendants knowingly and willfully operated their business with a policy of failing to pay Plaintiffs, FLSA Collective Plaintiffs, and Class Members for all hours worked, including overtime, due to Defendants' policy of time shaving.

84.     Defendants knowingly and willfully operated their business with a policy of deducting invalid meal credits from the wages of Plaintiffs, FLSA Collective Plaintiffs, and Class Members, in violation of the FLSA and the NYLL.

85.     Plaintiffs retained Lee Litigation Group, PLLC to represent Plaintiffs in this litigation and has agreed to pay the firm a reasonable fee for its services.

## STATEMENT OF CLAIM

## COUNT I

## VIOLATION OF THE FAIR LABOR STANDARDS ACT

86.　Plaintiffs reallege and incorporate all the foregoing paragraphs as if fully set forth herein.

87.　At all relevant times, Defendants were and continue to be employers engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a). Further, Plaintiffs and FLSA Collective Plaintiffs are covered individuals within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a).

88.　At all relevant times, Defendants employed Plaintiffs and FLSA Collective Plaintiffs within the meaning of the FLSA.

89.　At all relevant times, each Corporate Defendant had gross annual revenues in excess of $500,000.

90.　At all relevant times, Defendants failed to pay Plaintiffs and FLSA Collective Plaintiffs for all hours worked, including overtime, due to a policy and practice of time shaving.

91.　At all relevant times, Defendants had a policy and practice of improperly deducting meal credits from Plaintiffs and FLSA Collective Plaintiffs.

92.　Defendants failed to properly disclose or apprise Plaintiffs and FLSA Collective Plaintiffs of their rights under the FLSA.

93.　As a direct and proximate result of Defendants' willful disregard of the FLSA, Plaintiffs and FLSA Collective Plaintiffs are entitled to liquidates (i.e., double) damages pursuant to the FLSA.

94.     Records, if any, concerning the number of hours worked by Plaintiffs and FLSA Collective Plaintiffs and the actual compensation paid to Plaintiffs and FLSA Collective Plaintiffs should be in the possession and custody of the Defendants. Plaintiffs and FLSA Collective Plaintiffs intend to obtain these records by appropriate discovery proceedings to be taken promptly in this case and, if necessary, will then seek leave of Court to amend this Complaint to set forth the precise amount due.

95.     Defendants knew of and/or showed a willful disregard for the provisions of the FLSA as evidenced by their intentional failure to compensate Plaintiffs and FLSA Collective Plaintiffs for every hour they worked, including regular hours and overtime hours.

96.     Defendants failed to properly disclose or apprise Plaintiffs and FLSA Collective Plaintiffs of their rights under the FLSA.

97.     As a direct and proximate result of Defendants' willful disregard of the FLSA, Plaintiffs and FLSA Collective Plaintiffs are entitled to liquidated (i.e., double) damages pursuant to the FLSA.

98.     Due to the intentional, willful and unlawful acts of Defendants, Plaintiffs and FLSA Collective Plaintiffs suffered damages in an amount not presently ascertainable of unpaid wages, including overtime, unpaid wages due to invalid meal credit, plus an equal amount as liquidated damages.

99.     Plaintiffs and FLSA Collective Plaintiffs are entitled to an award of his reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 216(b).

## COUNT II

## VIOLATION OF THE NEW YORK LABOR LAW

100.    Plaintiffs reallege and incorporate all the foregoing paragraphs as if fully set forth herein.

101.    At all relevant times, Plaintiffs and Class Members were employed by Defendants within the meaning of the NYLL §§ 2 and 651.

102.    Defendants knowingly and willfully had a practice and policy of failing to pay proper wages, including overtime, to Plaintiffs and Class Members due to time shaving.

103.    Defendants willfully violated Plaintiffs' and Class Members' rights by improperly deducting meal credits from Plaintiffs and Class Members regardless of whether the meal credit deducted exceed the meals' "reasonable cost", whether the meals provided satisfied New York State's nutritional requirements containing all four (4) food groups, whether Plaintiffs and Class Members consumed the meals in question, and whether Plaintiffs and Class Members consumed the meals in question during a reasonable meal period.

104.    Defendants knowingly and willfully failed to provide Plaintiff and Class Members with proper wage statements as required under the NYLL.

105.    Defendants knowingly and willfully failed to provide Plaintiff and Class Members with proper wage and hour notices as required under the NYLL.

106.    Due to the Defendants' NYLL violations, Plaintiff and Class Members are entitled to recover from Defendants unpaid wages, including overtime; unpaid wages due to invalid meal credits; reasonable attorneys' fees, liquidated damages; statutory penalties; and costs and disbursements of the action, pursuant to NYLL.

107.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

a.  A declaratory judgment that the practices complained of herein are unlawful under the FLSA and the NYLL;

b.  An injunction against Defendants and its officers, agents, successors, employees, representatives and any and all persons acting in concert with them as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

c.  An award of unpaid wages, including overtime, due to time shaving due under the FLSA and NYLL;

d.  An award of unpaid wages due to Defendants' improper meal credit deductions, due under the FLSA and the NYLL;

e.  An award of statutory penalties as a result of Defendants' failure to comply with NYLL wage notice and wage statement requirements;

f.  An award of liquidated and/or punitive damages as a result of Defendants' willful failure to pay all wages, pursuant to 29 U.S.C. § 216;

g.  An award of liquidated and/or punitive damages as a result of Defendants' willful failure to pay proper wages, pursuant to the NYLL;

h.  An award of prejudgment and post judgment interest, costs and expenses of this action together with reasonable attorneys' and expert fees and statutory penalties;

i.  Designation of Plaintiffs as Representatives of the FLSA Collective Plaintiffs;

j.  Designation of this action as a class action pursuant to FRCP 23;

k.  Designation of Plaintiffs as Representatives of the Class; and

l.  Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury on all issues so triable as of right by jury.

Dated: May 13, 2025

<div style="margin-left: 50%;">

Respectfully submitted,

By: */s/ C.K. Lee*
　　C.K. Lee, Esq.

**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
148 West 24th Street, 8th Floor
New York, NY 10011
Tel.: 212-465-1188
Fax: 212-465-1181
*Attorneys for Plaintiffs, FLSA Collective*
*Plaintiffs, and Class Members*

</div>